Argued and submitted March 30; resubmitted
in banc September 2, affirmed October 19,
reconsideration denied December 4, 1981,
petition for review denied January 26, 1982 (292 Or 450)

## STATE OF OREGON,
### *Respondent,*
*v.*
## NORMAN ELMER MILLER,
### *Appellant.*

### (No. C 80-04-31487, CA 18683)

634 P2d 1361

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Norman Elmer Miller filed an appellant's supplemental brief pro se.

Rudolph S. Westerband, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

JOSEPH, C. J.

### JOSEPH, C. J.

Defendant was convicted on two counts of arson in the first degree and one count of criminal mischief in the first degree for bombing a public restroom. He appeals, assigning error to the trial court's failure to suppress evidence seized under a search warrant following his allegedly illegal arrest. He maintains that the arrest tainted the subsequent search warrant.

On April 22, 1980, the Portland Police Bureau received a phone call from a person claiming that he planned to detonate a bomb somewhere in downtown Portland the following day and would call again before exploding it. The call was traced to a phone booth on Southwest Third Avenue and Salmon Street. The police organized a squad to respond to any subsequent calls. They thought that the person might call from the same booth or another booth in the vicinity. Two plainclothes officers (Tersek and Braaten) were instructed to check the phone booths in that area, if a second call did come.

The following day, at 10:13 a.m., the person phoned again. The call lasted about four minutes. Immediately, members of the squad were notified, and a tracer was instituted, which revealed that the call was made from the same booth as the one the day before. Over the radio Tersek and Braaten received the information that a call had been received (but not that it was being traced) and proceeded south on Southwest Third Avenue toward Salmon. They saw no one in any phone booth along the route until they spotted defendant in a booth at Southwest Third Avenue and Taylor (one block north of Salmon) at approximately 10:23. The officers testified that defendant attracted their attention because he was the only person in a phone booth, and he was wearing both a dark raincoat and sunglasses on a sunny day. One officer felt defendant was watching them and attempting to move in the booth so the officers' view would be obscured by a telephone pole, but he could not be certain because of defendant's sunglasses.

Unknown to the officers at the time, another call had been made to the central office at 10:23. It lasted about a minute. About the same time the tracer report on the first

call came through. Almost immediately, the police also received a tracer report that the second call came from Southwest Third Avenue and Taylor. The officer who took the calls understood, because of the rapid succession of events, that the second tracer report was a correction of the first. The confusion was not cleared up for several minutes. The radio officer did not relay the new information to the various police units in the field, but he did broadcast an alert that the bomb was in a public restroom in Lownsdale Square on Salmon Street between Third and Fourth Avenues.

At 10:26, by his watch, Tersek left the police car to follow the suspect on foot. He did not know of the tracer results. Just as he was leaving the vehicle, he heard the report of the bomb's location over the police radio. Defendant left the booth, removed his sunglasses and proceeded to walk, at first slowly, then at a fast pace, toward his car several blocks away. He crossed Second Avenue and Salmon, a block and a half from the location of the bomb, and Tersek observed him give a "hard look" in that direction. As defendant unlocked his car and opened it, Tersek placed a hand on his shoulder, identified himself as a police officer and, without allowing him to turn around, patted him down. At that point, Tersek testified, he observed in the car a pair of needle-nose pliers, a screwdriver and a wire with an alligator clip on the end.[1] Tersek read defendant the *Miranda* rights and asked him to step over to the curb. Defendant indicated that he understood his rights; he did not ask the reason for his being stopped. When questioned, he gave his name and stated that he had made a phone call to a rock shop on Sandy Boulevard and that he had parked three blocks from the phone booth, because "I sometimes come down in this area to pick up whores."

---

[1] Defendant correctly points out that these items were not on the list of things seized in a subsequent search of defendant's car. This objection goes to the weight of the evidence and does not preclude consideration of this testimony in determining whether there was probable cause to arrest defendant. However, it is not entirely clear from the transcript whether these items were seen before the initial contact between Tersek and defendant. Were that crucial, we would perhaps need to determine exactly when the stop occurred. However, even assuming that the stop occurred at the very beginning of the encounter, we conclude there was sufficient justification at that point.

At that point a second officer (Goodale) arrived and took over the investigation. Goodale was aware of the most recent phone call, which had been traced to the booth at Third Avenue and Taylor, and was informed of what Tersek had observed. At 10:33, the bomb exploded. According to Goodale, defendant's face turned ashen. The officers asked defendant for consent to a search of his car, but he refused. (The car was later searched at the scene under a search warrant.) Goodale double-checked the conflicting information on the phone traces and concluded that defendant was a prime suspect. Defendant was then handcuffed and taken to police headquarters.

At the suppression hearing, the district attorney stated:

> "I would ask the Court to take judicial notice that the — well, we have had testimony that the defendant was arrested at 10:30 a.m. on the 23rd of April. Is there any question about that, counsel?
>
> "MR. RANSOM [defense counsel]: No. We stipulate to that."

Both sides characterize this exchange as a stipulation that defendant was arrested at 10:30 a.m. For several reasons, we do not regard this stipulation as fixing a *precise* time of the arrest in the course of the total encounter, but only that at approximately this point, defendant was in fact arrested. First, there was no testimony by anyone that any particular event occurred at 10:30; indeed, there was a period of about seven minutes (10:26 to after 10:33) during which no time is assigned in the testimony to any occurrence. Second, there was no evidence that the watches of the various officers were synchronized or agreed with official time. The various times reported were not so certain as to enable the district attorney to establish precisely the time of defendant's arrest to the minute.

Defendant was not arrested (contrary to defendant's contention) upon the initial detention, but sometime after the arrival of Goodale. Tersek's original contact with defendant constituted a stop. ORS 131.605(5). Because of

the nature of the crime of which defendant was suspected,[2] he was entitled at that point to frisk defendant for weapons. ORS 131.625(1). Unlike the situation in *State v. Groda,* 285 Or 321, 591 P2d 1354 (1979), cited by defendant, Tersek had not searched defendant's person. In *Groda* the court determined that an arrest had occurred precisely because a search of defendant had been conducted which could only be justified as a search incident to arrest. 285 Or at 325-26. Although the fact that *Miranda* warnings were given almost immediately is relevant, that bears principally on the officer's subjective state of mind. Tersek's questions and conduct were consistent with the reasonable inquiry into suspicious circumstances authorized by ORS 131.615(3).

██ To justify the initial stop of defendant, Tersek must have had a reasonable, articulable basis under all the circumstances for suspecting defendant of a crime. ORS 131.615(1); 131.605(4). At the time of the stop, the following facts were the basis for Tersek's suspicion: a) a telephone call to police headquarters on April 22, 1980, claiming that the caller planned to detonate a bomb somewhere in downtown Portland the following day and that he would call again before detonating it; b) tracing of that call to a telephone booth at Southwest Third and Salmon; c) likelihood that the bomber might call again from the same area he telephoned from the previous day; d) defendant's somewhat peculiar attire and conduct in the phone booth; e) defendant being the only person using a phone in the vicinity; and f) the "hard look" by defendant toward the Lownsdale Park restroom, which was known by Tersek at the time he made the observation as the location of the bomb. As defendant points out, there are alternative innocent explanations for each of his actions which arguably militate against Tersek's conclusion. Nonetheless, the facts created a sufficient basis for a reasonable suspicion.

---

[2] Although he was convicted of arson and criminal mischief, if he planted the bomb and if he made the calls, defendant could have been charged with attempting these crimes, even had there been no explosion. ORS 161.405. This is not to say that there were no other crimes actually committed before the bomb went off. *See, e.g.,* ORS 164.215 (burglary in the second degree); ORS 164.245 (criminal trespass in the second degree).

The patrol of the area was based on the speculation that the caller might call again from the same area he did before. The decision to pursue this possibility was presumably a product of collective police experience, even though there was no direct evidence to that effect. In any event, the speculation was not unreasonable, in view of the fact that the caller had used a public phone in that specific area. That the officers spotted defendant as much as nine minutes after the call on April 23 was placed may weaken the probability that he was the caller (because there was plenty of time to make the call and leave the area), but Tersek was not aware of the exact time the first call began or that it had terminated. He also did not know that there were two calls, the first of which had been made from a booth other than the one occupied by defendant, one block away. As far as he knew, the bomber might still be on the phone, possibly in a phone booth in the area.

Defendant's dress (arguably prudent attire for Oregon spring weather) and demeanor added little substance to Tersek's suspicion, other than to single out defendant as a person worthy of further observation. Similarly, that defendant's being the only person in a phone booth at that time might have been pure coincidence, given the time (mid-morning on a business day) and place (downtown Portland), weakened, but did not destroy, the objective validity of the hunch that the caller might call from the same area.

When defendant left the phone booth, there was nothing of substance to distinguish him from anyone who might have stopped en route to his destination to make a call from a public phone. When he paused to stare in the direction of the Lownsdale Park restroom in a manner which, by Tersek's testimony, was more intense than that of the ordinary citizen scanning the street for oncoming traffic, he was transformed into a person who made a phone call about the same time as the bomber in an area from which the bomber might have been calling and who had more than a passing interest in the restroom. On this basis, Tersek was entitled to stop defendant and make an inquiry.

As events developed during the stop, there also came to be probable cause to arrest defendant. ORS

133.310(1). Tersek observed the tools and the wire with the alligator clip in the car. Goodale arrived and heard Tersek's report. The bomb then went off. Goodale verified that the second call came from the booth in which defendant had been spotted at virtually the same time. Given all this, Goodale had a well-warranted belief that defendant was the perpetrator of the bombing. It follows that the motion to suppress was properly denied.

Defendant filed a supplemental brief *pro se* raising additional assignments of error. He first contends he was prejudiced because, when defendant requested a preliminary hearing on the information, the state dropped the information under which he was initially charged, and submitted the matter to the grand jury. The substance of this contention is that the state had insufficient evidence to indict, which, defendant argues, would have been demonstrated had the state proceeded with the hearing requested by defendant following filing of the information. He points out that the grand jury sought unsuccessfully on three occasions to compel him to give handwriting and voice exemplars and argues that this shows the evidence submitted to the grand jury was insufficient to support an indictment, inasmuch as it was seeking more.

The attempts to obtain the exemplars were no more than an exercise of the grand jury's right to compel the production of evidence "within its reach," ORS 132.320(4); and defendant's interpretation of these attempts is undermined by the grand jury's return of an indictment without the exemplars. In any event, defendant cannot show prejudice by challenging the sufficiency of the evidence to indict (*see* ORS 132.390), because the matter is beyond the power of this court to review. An indictment is not evidence of guilt, and any substantive defect is either exposed or cured by the state's obligation to prove the accusation at trial. *State v. Guse,* 237 Or 479, 481-82, 392 P2d 257 (1964).

Defendant also argues he was prejudiced by the unauthorized presence in the grand jury proceedings of a guard and a police officer. ORS 132.090(1) provides:

"No person other than the district attorney or a witness actually under examination shall be present during the sittings of the grand jury; provided, however, that upon a

motion filed by the district attorney in the circuit court, the circuit judge may appoint a reporter who shall attend the sittings of such grand jury and take and report the testimony in any matters pending before the grand jury; and provided further, that the circuit judge, upon the district attorney's showing to the court that it is necessary for the proper examination of a witness appearing before the grand jury, may appoint an interpreter, guard, a medical or other special attendant or a nurse, who shall attend such sittings."

The state's response to defendant's motion to dimiss the indictment included an affidavit that the persons were present only during the attempt to procure the exemplars. The motion to dismiss was not based on either ground set out in ORS 135.510(1), which reads:

"The indictment shall be set aside by the court upon the motion of the defendant in either of the following cases:

"(a)  When it is not found, indorsed and presented as prescribed in ORS 132.360, 132.400 to 132.430 and 132.580.

"(b)  When the names of the witnesses examined before the grand jury are not inserted at the foot of the indictment or indorsed thereon."

These are the only statutory grounds for dismissing an indictment, *State v. Whitney,* 7 Or 386, 388 (1879), and defendant asserted no constitutional ground for dismissal of the indictment.

On the day the bomb went off, police located a witness, Littleman, who identified defendant as the man he saw in the restroom that morning and mistook for a maintenance man working on the toilet. His identification provided a partial basis for the warrant to search defendant's apartment, and he testified at the grand jury proceeding. He had disappeared by the day of trial, although he was subpoenaed by the state. The state moved to continue both the trial and the hearing on the motion to suppress the identification until Littleman could be found. Defendant opposed the motion. The trial court thereupon suppressed the identification and prohibited mention of it at trial.

Defendant contends he was prejudiced, because he was not afforded the opportunity to cross-examine

Littleman at any point. There is no record that the contention defendant makes here was ever raised below. It is now his theory that Littleman's story was untruthful and that Littleman was suspect by virtue of his admitted proximity to the restroom about the time of the bombing. This position is contrary to defendant's position taken with respect to the trial continuance requested by the state; if Littleman was important to the defense, defendant should have joined in the motion. There is nothing in the record on which to posit the claimed error.

■ Defendant objected to an alleged remark by the district attorney in his opening statement that a "blasting cap" had been discovered near the right rear wheel of defendant's car. He claims prejudice because the state subsequently offered in evidence a box of blasting caps found in defendant's home. The opening statement is not in the transcript, but in discussing the later objection to certain exhibits, both the district attorney and the trial judge recalled that the reference had been qualified (*i.e.,* "a suspected blasting cap"). Error is not assigned to the admission of the exhibits or the testimony about the blasting caps found in defendant's apartment, so the wording of the opening statement, whatever it actually was, was not prejudicial.

■ The trial court admitted police bureau tape recordings of the phone conversations with the bomber. Defendant contends the admission was contrary to ORS 165.545:

"(1) Nothing in ORS 165.535, 165.540 and this section, shall be construed as preventing fire or police governmental entities from recording, replaying or broadcasting telephonic or radio messages that directly concern police or fire operation at the telephone or radio operation center or centers of such governmental entity.

"(2) No recording of telephonic or radio conversation recorded by fire or police governmental entities shall be admissible in evidence in any court of this state."

Defendant concedes that *State v. Maffia,* 42 Or App 147, 600 P2d 446 (1978), *rev den* 288 Or 519 (1980), governs. In that case, we said:

"* * * The evident purpose [of the statute] was to allow recording of police and fire operational communications

including telephone reports of crime and requests for assistance by private persons who would not necessarily be aware that their calls were being recorded, but, for reasons sufficient to the legislature, to bar use of those recordings in evidence. There is no suggestion that recording of telephone communications by the police other than those which 'directly concern police or fire operation *at the telephone or radio operation center'* were to be subject to the absolute evidentiary bar rather than to the regulation applicable to all other telecommunication. (Emphasis supplied.)" 42 Or App at 150.

The trial court found that the recordings had not been made at an operations center and so held the evidence admissible. Defendant asserts that *Maffia* is wrong and should be overruled.

The trial court properly applied the *Maffia* decision. Defendant makes a plausible argument that our decision in that case was erroneous. *Maffia* was denied review by the Supreme Court. The legislature has now repealed ORS 165.545(2), effective November 1, 1981. Or Laws 1981, ch 806, § 2. In those circumstances we decline to reconsider the decision.

Defendant's other *pro se* assignments of error are without merit and need no discussion.

Affirmed.